Matter of Elizabeth St. Garden, Inc. v City of New York (2024 NY Slip Op 03321)

Matter of Elizabeth St. Garden, Inc. v City of New York

2024 NY Slip Op 03321 [42 NY3d 992]

June 18, 2024

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, December 18, 2024

[*1]

In the Matter of Elizabeth Street Garden, Inc., et al., Appellants,
v
City of New York et al., Respondents.

Argued May 15, 2024; decided June 18, 2024

Matter of Elizabeth St. Garden, Inc. v City of New York, 217 AD3d 599, affirmed.

APPEARANCES OF COUNSEL

Sigel Teitelbaum & Evans, LLP, New York City (Norman H. Siegel, Herbert Teitelbaum and Goutam U. Jois of counsel) and McLaughlin & Stern, LLP, New York City (Steven J. Hyman, Oliver R. Chernin and Gabrielle N. Esposito of counsel), for appellants.
Sylvia O. Hinds-Radix, Corporation Counsel, New York City (Jamison Davies, MacKenzie Fillow and Richard Dearing of counsel), for respondents.

{**42 NY3d at 993} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be affirmed, with costs, and the certified question not answered as unnecessary.
This CPLR article 78 proceeding challenges a negative declaration issued by respondent New York City Department of Housing Preservation and Development (HPD) relating to development of affordable housing on a lot in the Nolita neighborhood of Manhattan. The property is owned by the City of New York and leased on a month-to-month basis since 1991{**42 NY3d at 994} to a corporation owned by the late petitioner Allan Reiver.[FN*] Beginning in 2005, Reiver used the lot as a green space/sculpture garden accessible through his adjacent art gallery. After the City identified the lot as a potential site for affordable senior housing in 2013, Reiver opened the space to the public directly through a gate [*2]on Elizabeth Street. The garden is currently open for a limited number of hours per week and is operated and maintained by volunteers.
The proposed project, a Type I action under the State Environmental Quality Review Act (SEQRA) (ECL art 8), entails construction of a seven-story mixed-use building that will include 123 units of affordable senior housing and at least 6,700 square feet of publicly accessible open space. Because the project involves the transfer of City property to private developers, approval for disposition of the property was also required pursuant to the Uniform Land Use Review Procedure (ULURP) (NY City Charter § 197-c). Reiver and the other petitioners commenced this CPLR article 78 proceeding challenging both the negative declaration issued by the lead agency, HPD, and the approval of the ULURP application by both the New York City Planning Commission and the City Council.
Judicial review of a SEQRA determination is generally limited to whether the determination is arbitrary and capricious, an abuse of discretion, or affected by an error of law (see Matter of Chinese Staff & Workers' Assn. v Burden, 19 NY3d 922, 924 [2012]; CPLR 7803 [3]). More specifically, we are concerned with whether the lead agency "identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986] [citations omitted]). The court's role is not "to weigh the desirability of any action or choose among alternatives," but to ensure that "agencies will honor their mandate regarding environmental protection by complying strictly with prescribed procedures and giving reasoned consideration to all pertinent issues revealed in the process" (Jackson, 67 NY2d at 416-417). In other words, "[w]hile judicial review must be meaningful, the courts may not substitute their{**42 NY3d at 995} judgment for that of the agency" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 232 [2007] [internal quotation marks and citations omitted]).
Here, HPD identified appropriate areas of concern, took the necessary "hard look," and rationally determined that the project would not have a significant adverse impact on the environment. In particular, using the methodology and guidelines set forth in the then-applicable 2014 City Environmental Quality Review (CEQR) Technical Manual, the environmental assessment statement (EAS) identified the study area as being underserved with respect to open space and concluded that the loss of the garden would cause a decrease in the open space ratio. Accordingly, the EAS then identified and described the open spaces in the study area and determined, based on its consideration of quantitative and qualitative factors, that there would be no significant adverse impact on open space. HPD rationally determined that the deficiency caused by the project would be ameliorated by several factors—including the quality of the remaining open space, the project's addition of a 0.15-acre open space resource for public use, and the proximity of Washington Square Park. The EAS further observed that the population that would be added by the project was unlikely to noticeably affect the usage of open space in the area.
The argument that HPD failed to take a hard look at public policy in the area of sustainability and the impact of climate change likewise lacks merit. The project will be built to Passive House construction standards in order to minimize its energy impact. Furthermore, neither the CEQR Technical Manual, which is largely focused on reducing greenhouse gas emissions, nor the Mayor's executive order on climate action (NY City Executive Order [de Blasio] No. 26), committing to the principles and goals of the Paris Agreement, establish standards for evaluating a project's impact in the area of climate change. The agency is not required to address "every conceivable environmental impact" (Matter of Neville v Koch, 79 NY2d 416, 425 [1992]) and petitioners point to no published standards for assessing climate change concerns in a project of this type in general, let alone in the specific areas of urban heat and stormwater runoff. Ultimately, a negative declaration is properly issued where, as here, "the agency has made a thorough investigation of the problems involved and reasonably exercised its discretion" (Matter of Spitzer v Farrell, 100 NY2d 186, 190 [2003] [internal quotation marks, brackets and citation omitted]).{**42 NY3d at 996}
Petitioners' contentions related to the project's compliance with local zoning requirements are not the proper subject of this proceeding. "[E]xcept where the proposed action is a zoning amendment, SEQRA review may not serve as a vehicle for adjudicating legal issues concerning compliance with local government zoning" (Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373, 382 [1992] [internal quotation marks and citation omitted]; see also NY City Charter § 197-c [a] [3], [4]).
Petitioners' remaining arguments are unavailing.

Rivera, J. (dissenting).
New York City is in the throes of an environmental crisis (AdaptNYC, Mayor's Office of Climate & Environmental Justice, https://climate.cityofnewyork.us/initiatives/adaptnyc/ [accessed June 2, 2024]). At the same time, New York City is also in dire need of affordable housing to counteract the steep rise in rents that has caused population displacement and homelessness at levels not seen since the Great Depression (Alex Horowitz & Adam Staveski, New York's Housing Shortage Pushes Up Rents and Homelessness, Pew Charitable Trusts, May 25, 2023, https://www.pewtrusts.org/en/research-and-analysis/articles/2023/05/25/new-yorks-housing-shortage-pushes-up-rents-and-homelessness [accessed June 3, 2024] ["The (rate of homelessness exacerbated by housing shortages) problem is acute in New York City, where 73 of every 10,000 people lack a home"]; Basic Facts About Homelessness, Coalition for the Homeless, https://www.coalitionforthehomeless.org/basic-facts-about-homelessness-new-york-city/ [accessed June 4, 2024]). The City says that it can and will address both these challenges. This appeal puts those dual commitments to the test.
Respondent New York City Housing Preservation and Development (HPD) conducted an initial environmental assessment of a proposed construction project on New York City-owned property that would demolish a community garden currently on the project site. HPD determined that although the study area has an open space deficiency, and the project would meaningfully reduce the existing publicly-available open space, the project would not have a significant effect on environmental quality. However, HPD failed to take the requisite hard look at the climate change impact of the project, including the reduction in open space, and did not provide a reasoned elaboration for its determination. The Appellate Division thus erroneously concluded that HPD complied with both state and city environmental{**42 NY3d at 997} quality review laws. I cannot agree with the majority's overly deferential approach that allows for less than rigorous environmental assessment. I dissent.
[*3]I.
A.
As the Earth's surface continues to heat at a rapid pace, global warming transforms our planet in dangerous and irreversible ways, leading to extreme weather, increased pollution, species extinction and disruption of life as we know it (New Analysis of National Climate Plans: Insufficient Progress Made, COP28 Must Set Stage for Immediate Action, United Nations Climate Change, Nov. 14, 2023, available at https://unfccc.int/news/new-analysis-of-national-climate-plans-insufficient-progress-made-cop28-must-set-stage-for-immediate [accessed June 4, 2024]; State of the Global Climate 2023, World Meteorological Organization, Mar. 19, 2024, available at https://wmo.int/publication-series/state-of-global-climate-2023 [accessed June 4, 2024]). In the face of this reality, the United Nations has declared that access to a clean, healthy and sustainable environment is a universal human right (GA/12437: With 161 Votes in Favour, 8 Abstentions, General Assembly Adopts Landmark Resolution Recognizing Clean, Healthy, Sustainable Environment as Human Right, United Nations Meetings Coverage & Press Releases, July 28, 2022, available at https://press.un.org/en/2022/ga12437.doc.htm). The world's scientific community and diverse general population have reached consensus: global warming threatens human survival. Nearly two thirds of 1.2 million persons surveyed worldwide said climate change is a global emergency and they support more comprehensive climate policies (The Peoples' Climate Vote, United Nations Development Programme, Jan. 26, 2021, https://www.undp.org/publications/peoples-climate-vote [accessed June 4, 2024]).
Almost a decade ago, in December 2015, world leaders at the United Nations Climate Change Conference entered the Paris Agreement, an international binding treaty on climate change intended to reduce global warming, joined by 196 parties, including the United States and the European Union (Environment and Conservation: Climate Change Paris Agreement, TIAS No. 16-1104 [Dec. 12, 2015]; The Paris Agreement, United Nations: Climate Action, https://www.un.org/en/climatechange/paris-agreement [accessed June 2, 2{**42 NY3d at 998}024]; Tanya Somanader, the White House President Barack Obama Blog, President Obama: The United States Formally Enters the Paris Agreement, https://obamawhitehouse.archives.gov/blog/2016/09/03/president-Obama-United-states-formally-enters-Paris-agreement [Sept. 3, 2013, 10:41 a.m.; accessed June 2, 2024]).[FN1] The Agreement set a target of "substantially reduc[ing] global greenhouse gas emissions to hold global temperature increase to well below 2 C above pre-industrial levels and pursue efforts to limit it to 1.5 C above pre-industrial levels, recognizing that this would significantly reduce the risks and impacts of climate change" (The Paris Agreement, United Nations: Climate Action, https://www.un.org/en/climatechange/paris-agreement [accessed June 2, 2024]). It also sought to increase financial resources so that countries could achieve these targets, and set in place a framework to evaluate individual countries' progress.
Despite the hope that governments were finally on track to stave off the worst of the effects of global warming, the news is disheartening.
In 2022, the Secretary-General issued the following statement:
"The jury has reached a verdict. And it is damning . . . We are on a fast track to climate disaster. Major cites under water. Unprecedented heatwaves. Terrifying storms. Widespread water shortages. The extinction of a million species of plants and animals. This is not fiction or exaggeration . . . This is a climate emergency. Climate scientists warn that we are already perilously close to tipping points that could lead to cascading and irreversible climate impacts" (SG/SM/21228: Secretary-General Warns of Climate Emergency, Calling Intergovernmental Panel's Report 'a File of Shame', While Saying Leaders 'Are Lying', Fuelling Flames, United Nations Meetings Coverage & Press Releases, Apr. 4, 2022, available at https://press.un.org/en/2022/sgsm21228.doc.htm [accessed June 4, 2024]).
According to the 2023 report from the United Nations Intergovernmental Panel on Climate Change:
"Human activities, principally through emissions of {**42 NY3d at 999}greenhouse gases, have unequivocally caused global warming, with global surface temperature reaching 1.1 C above 1850-1900 in 2011-2020. Global greenhouse gas emissions have continued to increase, with unequal historical and ongoing contributions arising from unsustainable energy use, land use and land-use change, lifestyles and patterns of consumption and [*4]production across regions, between and within countries, and among individuals" (Intergovernmental Panel on Climate Change, Climate Change 2023 Synthesis Report, Summary for Policymakers at 4 [2023], available at https://www.ipcc.ch/report/ar6/syr/downloads/report/IPCC_AR6_SYR_SPM.pdf [accessed June 11, 2024]).
Furthermore:
"In urban areas, observed climate change has caused adverse impacts on human health, livelihoods and key infrastructure. Hot extremes have intensified in cities. Urban infrastructure, including transportation, water, sanitation and energy systems have been compromised by extreme and slow-onset events, with resulting economic losses, disruptions of services and negative impacts to well-being. Observed adverse impacts are concentrated amongst economically and socially marginalised urban residents" (id. at 6).
As Climate Action Tracker, an independent scientific project, summarized:
"[t]he new IPCC report on climate science has reinforced the absolute urgency of closing the 2030 emissions gap if there is to be any chance of limiting warming to 1.5 C . . . [By 2030] global emissions must be cut by 50%, and governments are nowhere near this" (Global Update: Climate Target Updates Slow as Science Demands Action, Climate Action Tracker, available at https://climateactiontracker.org/publications/global-update-september-2021/ [accessed June 11, 2024] [emphasis added]).
However, there are environmental projects that can bring relief, even if the world is behind schedule on achieving the Paris Agreement target reductions. Indeed, the United Nations{**42 NY3d at 1000} has recognized the importance of green spaces in the race to save the planet, noting:
"Parks, green spaces and waterways are important public spaces in most cities. They offer solutions to the effects of rapid, unsustainable urbanization on health and well-being. The social and economic benefits of urban green spaces are equally important, and should be viewed in the context of global issues such as climate change, as well as other priorities set out in the SDGs, including sustainable cities, public health and nature conservation. . . . Increasing the number and quality of green spaces has the potential to mitigate short-lived climate pollutants that produce a strong global warming effect and contribute significantly to more than 7 million premature air-pollution related deaths annually. . . . For every tree strategically planted to provide shade, there could be a direct reduction of approximately 10 kg in carbon emissions from power plants through reduced demand for air conditioning. . . . Therefore, investments in city parks, green spaces, and waterways are an effective and economical way to both promote health and mitigate climate change" (Nathalie Röbbel, Green Spaces: An Invaluable Resource for Delivering Sustainable Urban Health, UN Chronicle, https://www.un.org/en/chronicle/article/green-spaces-invaluable-resource-delivering-sustainable-urban-health [accessed June 3, 2024]).
B.
In New York City, ongoing climate change has been the catalyst for extreme weather events, including Superstorm Sandy and Hurricane Ida, which have caused death and billions of dollars in property damage and revenue losses (Hurricane Sandy: Impact of Hurricane Sandy, NYC Community Development Block Grant Disaster Recovery, https://www.nyc.gov/site/cdbgdr/hurricane-sandy/hurricane-sandy.page [accessed June 3, 2024]; Hurricane Ida: Overview, NYC Community Development Block Grant Disaster Recovery, https://www.nyc.gov/site/cdbgdr/hurricane-ida/hurricane-ida.page [accessed June 3, 2024]).
In full appreciation of the City's global standing and potential leadership on this issue, New York City has declared a public{**42 NY3d at 1001} policy to mitigate climate change effects and the damage and inequalities that result from environmental disasters. On June 2, 2017, the City's mayor issued Executive Order No. 26, which declares, "[W]e all have a moral, economic, public health, and security imperative to act to protect our planet, fellow human beings, and future generations" (NY City Executive Order [de Blasio] No. 26 [June 2, 2017]). The order further provides that "climate action taken by cities in the United States and around the world can result in 40% of the pollution reduction needed globally to limit warming to only 1.5 degrees Celsius," and, "the many benefits of climate action by cities also address issues of inequality including the expanding wealth gap, the lack of housing, the accessibility of public transit, aging infrastructure, and other major urban challenges" (id.). The Executive Order declares that the City adopts and commits to the principles and goals of the Paris Agreement. Section 1 of the Executive Order states:
"To protect our residents and all human beings from the effects of climate change, New York City will adopt the principles and goals of the Paris Agreement to deliver climate actions that are consistent with or greater than its own commitments to reduce its greenhouse gas emissions 80% by 2050 and that support the critical goal of holding the increase in the global average temperature to below 2 Celsius above pre-industrial levels and pursuing efforts to limit the temperature increase to 1.5 Celsius above pre-industrial levels, as set forth in the Paris Agreement, which entered into force on November 4, 2016" (id.).
Like the United Nations, the Mayor's Office of Climate and Environmental Justice has reaffirmed what City administrators, scientists and community advocates, have known for years: green space is essential for "[e]nsuring access to nature, improving stormwater management, and combatting extreme heat" (Green Space, Mayor's Office of Climate and Environmental Justice, https://climate.cityofnewyork.us/subtopics/green-space/ [accessed June 2, 2024]).
II.
For decades, spanning back into the prior century, New York City has failed to adequately address the affordable housing needs of our diverse communities. Inaction alone is not the{**42 NY3d at 1002} cause of the current crisis. Instead, New York City administrators have promoted commercial real estate development without also providing residential housing for the vast majority of the City's population that cannot afford skyrocketing rents or home prices. Without rent regulation or crammed living arrangements most low-income and middle-class New Yorkers cannot afford to live comfortably in the City where they were born, grew up, and work. Moreover, zoning and a legacy of redlining has segregated the City along racial and ethnic lines (see generally A Brief History of Redlining, Environment & Health Data Portal, https://a816-dohbesp.nyc.gov/IndicatorPublic/data-stories/redlining/ [June 3, 2024]; see Anbinder,"Power to the Neighborhoods!" New York City Growth Politics, Neighborhood Liberalism, and the Origins of the Modern Housing Crisis at 13-14, Joint Center for Housing Studies of Harvard University [Mar. 2024], available at https://www.jchs.harvard.edu/sites/default/files/research/files/harvard_jchs_power_neighborhoods_anbinder_2024.pdf [accessed June 3, 2024] ["(I)n middle-class white neighborhoods . . . , neighborhoodism became a cudgel wielded to resist racial integration and affordable housing . . . Subsequently, New Yorkers enacted laws and implemented processes that slowed the pace of development by requiring neighborhood input. In the parts of the city where the anti-growth vision was most appealing, these reforms became the neighborhood liberals' most pressing goal; today, it remains their most enduring legacy"]).
New York City continues to struggle with this affordable housing crisis and gentrification's displacement of low-income residents, especially residents of color. According to HPD, "[n]early all low-income New Yorkers are [*5]rent-burdened, allocating more than 30% of their income towards rent. Among households who earned less than $50,000 without rental assistance, 86% were rent burdened" (New York City's Vacancy Rate Reaches Historic Low of 1.4 Percent, Demanding Urgent Action & New Affordable Housing, NYC Housing Preservation & Development, Feb. 8, 2024, https://www.nyc.gov/site/hpd/news/007-24/new-york-city-s-vacancy-rate-reaches-historic-low-1-4-percent-demanding-urgent-action-new#/0 [accessed June 2, 2024]). The City Comptroller has declared that New York City is facing the tightest housing market in over 50 years, with rental vacancy rates falling to a multi-decade low, including fewer than 1% of vacant apartments with rents below $1,650 in 2023 (Office of New York City Comptroller Brad Lander,{**42 NY3d at 1003} Spotlight: New York City's Housing Supply Challenge [Feb. 13, 2024], https://comptroller.nyc.gov/reports/spotlight-new-york-citys-housing-supply-challenge/ [accessed June 2, 2024]). Deputy Mayor for Housing, Economic Development and Workforce Maria Torres-Springer has concluded that "to meet this need and turn the tide on our long-standing housing crisis, we need . . . to advance proposals and projects that will allow us to build and preserve more housing in every neighborhood across the city" (New York City's Vacancy Rate Reaches Historic Low of 1.4 Percent, Demanding Urgent Action & New Affordable Housing, NYC Housing Preservation & Development, Feb. 8, 2024, https://www.nyc.gov/site/hpd/news/007-24/new-york-city-s-vacancy-rate-reaches-historic-low-1-4-percent-demanding-urgent-action-new#/0 [accessed June 2, 2024]). Nevertheless, the City's commitment to building affordable housing in every neighborhood to address this crisis and counteract redlining remains unrealized (David Brand & Jaclyn Jeffrey-Wilensky, NYC data shows deep disparities in affordable housing creation, Gothamist, Mar. 7, 2024, https://gothamist.com/news/nyc-data-shows-deep-disparities-in-affordable-housing-creation [accessed June 3, 2024]). For example:
"The city has financed roughly 24,000 apartments with rents capped for low- and middle-income tenants since . . . the start of 2022. Most are located in densely populated parts of the city that are predominantly Black and Latino, like Central Brooklyn and the South Bronx . . . Just one new affordable unit has been built or financed in the 6th Council District, which covers the Upper West Side. In the 5th Council District on the Upper East Side, the number is 15. Both neighborhoods are among the wealthiest in New York City, census data shows" (id.).
This segregation, redlining and dearth of affordable housing in wealthier neighborhoods has left communities of color bearing the brunt of environmental contaminants. In New York and other cities,
"neighborhoods that are poorer and have more residents of color can be 5 to 20 degrees Fahrenheit hotter in summer than wealthier, whiter parts of the same city . . . In the 20th century, local and federal officials, usually white, enacted policies that reinforced racial segregation in cities and diverted{**42 NY3d at 1004} investment away from minority neighborhoods in ways that created large disparities in the urban heat environment" (Brad Plumer and Nadja Popovich, How Decades of Racist Housing Policy Left Neighborhoods Sweltering, NY Times, Aug. 24, 2020, https://www.nytimes.com/interactive/2020/08/24/climate/racism-redlining-cities-global-warming.html [accessed June 4, 2024]; Jaclyn Jeffrey-Wilensky, For NYC, the legacy of redlining is in the air we breathe, Gothamist, Apr. 1, 2022, https://gothamist.com/news/for-nyc-the-legacy-of-redlining-is-in-the-air-we-breathe [accessed June 4, 2024] ["On average, residents of formerly redlined neighborhoods are sicker, have more pregnancy and birth complications, are more vulnerable to extreme heat and die younger than their neighbors living in areas with more favorable ratings from the Home Owners' Loan Corporation"]).
Against this historical backdrop of ineffective housing policies and environmental justice gaps, the City has attempted to address the continuing need for affordable housing and fulfill its commitment to greener neighborhoods, and open spaces. This appeal involves a development project at the intersection of both these public policies.
III.
The proposed project is a mixed-use development consisting of 123 units of affordable senior housing and ground-floor retail space. The development is slated for construction in the lower Manhattan neighborhood known as "Nolita," which is near the cultural centers of Little Italy, Chinatown and the Lower East Side. Historically, the area and nearby neighborhoods were the home of recent arrivals, including Puerto Rican,[FN2] Chinese, Italian, and Jewish [*6]New Yorkers. They and their descendants built and maintained thriving ethnic and religious communities and{**42 NY3d at 1005} contributed to the City's economic stability.[FN3] The area has changed dramatically over the years and, through gentrification, has become unaffordable to most low and middle-income individuals or for those living in these areas requires they pay an excessive amount of their income in rent (Public Affairs, New York City gentrification creating urban 'islands of exclusion,' study finds, UC Berkeley News, Apr. 10, 2019, https://news.berkeley.edu/2019/04/10/new-york-city-gentrification-creating-urban-islands-of-exclusion-study-finds/).
The area has the highest median monthly rent in the City (Haven Green ULURP Application, citing Community District 2's Statement of Needs for Fiscal Year 2018). It is one of only two community districts in Manhattan in which the population is currently equal to or more than 75% white (There Is No Alternative, Haven Green [Nov. 19, 2018], citing Department of City Planning, Demographic Profiles of ACS 5 Year Estimates at the Neighborhood Tabulation Area [NTA] level, NYC OpenData, https://data.cityofnewyork.us/City-Government/Demographic-Profiles-of-ACS-5-Year-Estimates-at-th/8cwr-7pqn/about_data [accessed June 3, 2024]). Only 93 units of affordable housing have been built in the district since 2014 (There Is No Alternative, Haven Green [Nov. 19, 2018]; see also Department of Housing Preservation and Development, Affordable Housing Production by Building, NYC Open Data, https://data.cityofnewyork.us/Housing-Development/Affordable-Housing-Production-by-Building/hg8x-zxpr/data [accessed June 3, 2024]).
The area also suffers from the environmental problems typical of highly developed urban neighborhoods—traffic congestion, air and noise pollution, and limited open spaces. Indeed, this area is considered "underserved" for open space because there are only 0.193 acres of open space per 1,000 residents—well below the citywide community district median of 1.5 acres per 1,000 residents and city planning goals of 2.5 acres per 1,000 residents. As the City recognizes, the challenges of living in the area are heightened by the effects of climate change,{**42 NY3d at 1006} which include extreme heat, more and intense heat waves, and extreme rainfall that causes flooding and other stormwater damage (AdaptNYC, Mayor's Office of Climate & Environmental Justice, https://climate.cityofnewyork.us/initiatives/adaptnyc/ [accessed June 2, 2024]).
The project would be built on City-owned land that is currently leased and partially used as a 20,235 square foot sculpture and community garden, known as the Elizabeth Street Garden, which would be demolished under the plan. Like other proposed land development, the project is subject to New York State's and City's Environmental Quality Review laws (SEQRA and CEQR, respectively), and in 2018 HPD became the lead agency for SEQRA and CEQR purposes (ECL 8-0109 [2]; CEQR 7 [a]). The agency's "initial determination . . . under SEQRA and CEQR is whether an [environmental impact statement] is required, which in turn depends on whether an action may or will not have a significant effect on the environment" (Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364 [1986]).
In late 2018, HPD issued an environmental assessment statement (EAS) and a negative declaration which determined that the project will not have a significant environmental effect. The EAS found, in part, that the project as planned "would result in a decrease in the total, active, and passive open space ratios in an area underserved by open space" but nonetheless concluded that the project "would not result in a significant adverse open space impact." The EAS also found that relative to a no action condition in the neighborhood, there would be a 2.24% reduction in open space, to 0.149 acres of open space per 1,000 residents, and that the with-action active open space ratio would decrease by 0.13% to 0.124 acres per 1,000 residents.
In reaching its conclusions, HPD followed the CEQR Technical Manual (CEQRTM), which "provides guidance for city agencies, project sponsors, the public, and other entities in the procedures and substance of the City's Environmental Quality Review (CEQR) process" (New York City Mayor's Office of [*7]Environmental Coordination, 2014 CEQR Technical Manual at INTRODUCTION-1 [Mar. 2014], https://www.nyc.gov/assets/oec/{**42 NY3d at 1007}technical-manual/2014/Documents/2014_ceqr_technical_manual_rev_04_27_2016.pdf [accessed June 4, 2024]).[FN4] As described in the CEQRTM, if the study area's existing open space is adequate, decreases in open space ratios that approach or exceed 5% may be significant and require more detailed analysis. If the study area has a low open space ratio, as is the case here, even decreases below 5% may require detailed analysis. A detailed analysis under the CEQRTM requires the lead agency to disaggregate the study area population by age, types and quality of open space, and utilization rate of open space in the neighborhood. Although the criteria for determining the boundaries of study area or neighborhood has several factors, in general for the open space analysis, the study area is defined as "a reasonable walking distance that users would travel to reach local open spaces and recreation areas—typically 0.5 mile for residential users and 0.25 mile from commercial projects with a worker population" although the boundaries "should reflect existing conditions and may be irregularly shaped" (id. at 7-5 7-6). The CEQRTM further provides that a finding of a quantitative adverse impact on open space, requires that
"[t]he adequacy of the open space in the study area should be considered in order to determine whether [the] change in open space conditions and/or utilization results in a significant adverse effect to open space. To make this determination, the type of open space (active or passive), its capacity and conditions, the distribution of open space, whether the area is considered 'well-served' or 'underserved' by open space, the distance to regional parks, the connectivity of open space, and any additional open space provided by the project, including rooftop gardens, greenhouses, new active or passive open space, should be considered in relation to the quantitative changes identified above. These considerations may vary in importance depending on the project and the area in which it is located. For instance, provisions of new active open space may carry more weight in an area where a large residential population would be added as a result of the project." (2014 CEQR Technical Manual at 7-16).
HPD conducted its qualitative analysis of open space in the study area by identifying and inventorying open spaces by{**42 NY3d at 1008} their location, size, owner, type, utilization, equipment, hours, and condition. HPD concluded that a "deficiency of open space resources . . . would be ameliorated by several factors" because the majority of the open spaces are in good or excellent condition, eight nearby community gardens exist in the study area, nearby Washington Square Park is a "destination park" as defined under the CEQRTM, and a 0.15-acre open space would be constructed on the project site. Citing these qualitative factors, the EAS concluded the project would not significantly exacerbate the existing open space deficiency. The EAS and negative declaration obviated the need to prepare an environmental impact statement (EIS), which is the culmination of a fuller environmental review process (6 NYCRR 617.6 [a] [2]).
IV.
Petitioners are a neighborhood resident, two commercial entities and a nonprofit created after the project was slated for development in 2013.[FN5] They commenced this CPLR article 78 proceeding against respondents HPD, Torres-Springer in her capacity as HPD Commissioner, the New York City Council, and the New York City Planning Commission. The petition alleges various causes of actions based on alleged flaws in the EAS and environmental review process and asserts that the negative declaration should be nullified and respondents ordered to conduct a more comprehensive environmental review, with greater community participation, and the preparation of an EIS.
Supreme Court voided the negative declaration based on the lack of a significant adverse impact on open space and remitted to respondents for a full EIS. The Appellate Division reversed, confirmed the negative declaration, [*8]denied the petition and dismissed the proceeding (217 AD3d 599, 600 [1st Dept 2023]). The Appellate Division granted petitioners leave to appeal and certified the question of whether its decision was properly made.
I would reverse because HPD did not take a hard look at the significant effects on the environment due to the diminution in open space and how the project advances or frustrates the{**42 NY3d at 1009} City's climate change agenda.[FN6] Notably, HPD's conclusion that certain alternative spaces mitigate the open space impact lacks reasoned elaboration as to how the existing open space shortfall—which already accounts for these alternatives—can overcome a further diminution.
V.
A.
"The Legislature adopted SEQRA with the express intent that 'the protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations in public policy' and that SEQRA's policies, statutes and regulations should be implemented 'to the fullest extent possible' " (Matter of New York City Coalition to End Lead Poisoning v Vallone, 100 NY2d 337, 347 [2003], quoting ECL 8-0103 [7], [6]). Because SEQRA requires an agency
"to adopt procedures necessary to implement the requirements of the statute provided that such 'procedures shall be no less protective of environmental values [than the procedures provided in SEQRA]', although procedures more protective of the environment can be adopted[, an agency's] determination must be judged not only according to the requirements of SEQRA but also according to the regulations promulgated by the City of New York in CEQR to the extent those regulations are more protective of the environment" (Chinese Staff & Workers Assn., 68 NY2d at 364, quoting ECL 8-0113 [3] [a]).
And since agency regulations must accord with the City's stated public policy, the agency's environmental review may not undermine the City's climate change agenda. Thus, an agency's "initial determination . . . under SEQRA and CEQR is whether an EIS is required, which in turn depends on whether an action may or will not have a significant effect on the environment" (id. at 364, citing ECL 8-0109 [2]; CEQR 7 [a]).
"Where an agency determines that an EIS is not required, it will issue a negative declaration" ({**42 NY3d at 1010}Matter of Chinese Staff & Workers' Assn. v Burden, 19 NY3d 922, 924 [2012] [internal quotation marks and citation omitted]). "[T]he threshold triggering an EIS is relatively low" (id.), as "the legislative mandate [is] that an EIS be prepared when there is to be any proposed action that 'may have a significant effect on the environment' " (Inland Vale Farm Co. v Stergianopoulos, 65 NY2d 718, 720 [1985], quoting ECL 8-0109 [2]).
As we have explained, when conducting an EIS,
"[f]irst, the project sponsor or the lead state agency on the project may conduct an optional 'scoping session,' exploring the method to be used in assessing the project's environmental impact (see 6 NYCRR 617.8). Next, the lead agency must prepare or cause to be prepared a draft environmental impact statement (DEIS), to be filed with the Department of Environmental Conservation, which surveys the relevant environmental risks posed by the proposed project (ECL 8-0109; 6 NYCRR 617.12 [b] [6]). After the DEIS has been finished and publicly reviewed, the agency prepares and files a final environmental impact statement (FEIS) (ECL 8-0109 [6]). The DEIS and FEIS must analyze the 'environmental impact and any unavoidable adverse environmental effects' of the project under review, as well as 'alternatives to the proposed action . . . , including a "no-action alternative" . . . and mitigation measures' (Matter of Jackson, 67 NY2d at 416 [citations omitted]). Finally, before approving the project, the agency must 'make an explicit finding that the requirements of [SEQRA] have been met and that[,] consistent with social, economic[,] and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided' (ECL 8-0109 [8]). By administrative regulation, such finding must be contained in a written findings statement, which considers the conclusions reached in the FEIS, weighs and balances the relevant environmental impacts, and 'provide[s] a rationale for the agency's decision' (6 NYCRR 617.11 [c], [d]). . . .
"At each step, the agency must provide for public{**42 NY3d at 1011} comment, usually through a written public comment period (see 6 [*9]NYCRR 617.8 [e]; 617.9 [a] [2]-[5]; 617.11 [a], [b]; see generally Matter of Jackson, 67 NY2d at 415-416 [summarizing SEQRA process, including public comment requirements])" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 425-426 [2017]).
As we stated in Matter of Gernatt Asphalt Prods. v Town of Sardinia, our review of the agency's determination is circumscribed (87 NY2d 668, 688 [1996]).
"A court's authority to examine a SEQRA review conducted by an entity that was required to do so is limited to reviewing whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion. The relevant question before the court is 'whether the agency identified the relevant areas of environmental concern, took a "hard look" at them, and made a "reasoned elaboration" of the basis for its determination' " (id., quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]).
Furthermore, "[i]t is not our role to weigh the desirability of any proposed actions or choose among alternatives but only to insure that the agency has satisfied the substantive and procedural requirements of SEQRA and of the regulations implementing it" (Matter of Village of Westbury v Department of Transp. of State of N.Y., 75 NY2d 62, 66 [1989], citing Matter of Jackson, 67 NY2d at 416).
The "hard look" standard has its origins in federal case law from the DC Circuit adopted by the United States Supreme Court (Pikes Peak Broadcasting Co. v Federal Communications Commn., 422 F2d 671, 682 [DC Cir 1969]; Colorado Interstate Gas Co. v FPC, 324 US 581, 595 [1945]; Kleppe v Sierra Club, 427 US 390, 410 n 21 [1976]; Natural Resources Defense Council, Inc. v Morton, 458 F2d 827, 838 [DC Cir 1972]; Patrick Garry, Judicial Review and the "Hard Look" Doctrine, 7 Nev LJ 151 [2006]). It is essentially an arbitrary and capricious standard of review, a test of whether the agency engaged in reasoned decisionmaking and whether its process was effective and meaningful (Chinese Staff & Workers Assn., 68 NY2d at 363-364). It is not an opportunity for a court to weigh the benefits of the proposal or to substitute its own policy preferences{**42 NY3d at 1012} (Matter of Gordon v Rush, 100 NY2d 236, 244 [2003]). That is for the agency.

 B.
Based on this well-settled law and HPD's own findings, the negative declaration lacks legal and factual support. HPD found that the area suffers from a deficiency of open space and that the project would further reduce that amount. When an area is already below target for open land, a meaningful diminution—here a 2% reduction in the total open space ratio and a 11% reduction in the passive open space ratio—"may . . . have a significant effect on the environment" (Chinese Staff & Workers Assn., 68 NY2d at 364). Put another way, the status quo is already bad and unsustainable. Further reduction has two negative results. First, it means diminished opportunity for public enjoyment of undeveloped land and the attendant physical and emotional benefits of that use (Alison Rodriguez, US Dept of Agriculture Blog, Improving Urban Health through Green Space, https://www.usda.gov/media/blog/2017/11/28/improving-urban-health-through-green-space [Nov. 28, 2017; accessed June 2, 2024]). Second, an additional reduction in open space may undermine efforts to mitigate the effects of climate change.
As the City recognizes, climate change is the global environmental issue. HPD as the City's lead agency on the project is required to consider whether the project will have an adverse climate change impact, is consistent with the Paris Agreement and furthers or undermines the City's broader climate change goals. The majority's claim that there are no standards to guide HPD ignores the simple fact that the City has a climate change agenda, adopted the Paris Agreement and announced the importance of both green and open spaces to those climate change goals (Action on Global Warming: NYC's Green New Deal, City of New York [Apr. 22, 2019], https://www.nyc.gov/office-of-the-mayor/news/209-19/action-global-warming-nyc-s-green-new-deal#/0 [accessed June 2, 2024]). Thus, HPD has guideposts for its environmental assessment and compliance.
[*10]
Notably, in support of their claims, petitioners submitted an affidavit from Adrian Benepe, Commissioner of the Department of Parks and Recreation from 2002 until 2012, and now Senior Vice President and Director of National Programs for The Trust for Public Land, stating that green open spaces with trees, like Elizabeth Street Garden, are part of the City's green{**42 NY3d at 1013} infrastructure that mitigates stormwater runoff and rising temperatures, and that this is important with climate change. Petitioners also submitted an affidavit from Geoffrey K. Clark, hired by Elizabeth Street Garden, stating that because "the current land use is misrepresented" the EAS and negative declaration do not meet the threshold of a "hard look," and the open space in the proposed project may be more shaded than the garden. Just so.
Indeed, as Supreme Court concluded:
"respondents . . . fail to explain how the qualitative assessment reduces the significance of the quantitative reduction in open space caused by the project. Even if, assuming arguendo, the qualitative assessment identified factors that would mitigate the impact of the significant decline in the open space ratio caused by the project, there is no evidence that in the current record that such mitigations are sufficient to overcome such significance" (2022 NY Slip Op 33730[U], *18{**42 NY3d at 18}-19 [Sup Ct, NY County 2022]).
I agree that HPD did not give a hard look to these environmental issues and did not provide a reasonable elaboration for their determination (Matter of Gernatt Asphalt Prods., 87 NY2d at 688).
Contrary to the respondents' claims, and the majority's conclusion, HPD could not determine at this stage of environmental review whether the project's street-level, publicly-available open space, would offset the increase in deficiency because the project space would be available for more hours and days per year than the Elizabeth Street Garden. The City ignores that it could have negotiated longer hours with the Garden, and petitioners maintain that the lessee was willing to do so. Nor could respondents conclude that the existence of other open space in the vicinity would mitigate the impact, like the qualitative analysis under CEQRTM of the condition, utilization rates, and types of usage of open space in the study area. As recognized in the EAS, even accounting for those other spaces, the study area was underserved for open space. In any case, whether the other spaces were viable alternatives could not be determined without community input regarding obstacles to utilization, including longer distances from home, overcrowding in smaller spaces, accessible transportation and the lack of amenities and programming provided by the Garden{**42 NY3d at 1014} in comparison to surrounding lots and parks. As required by SEQRA and CEQR, the adequacy of these alternatives could only be determined by preparation of an EIS and fuller community engagement.
Given that "the threshold triggering an EIS is relatively low" (Matter of Chinese Staff & Workers Assn., 19 NY3d at 924) and "the legislative mandate [is] that an EIS be prepared when there is to be any proposed action that may have a significant effect on the environment" (Inland Vale Farm Co., 65 NY2d at 720 [internal quotation marks and citation omitted]), HPD erred in issuing a negative declaration and failing to establish how a project that exacerbates the open space deficiency in the area may not possibly affect environmental quality.
The fact is that the City is committed to providing affordable housing. Having assumed that obligation, it is the City's legal and moral responsibility to ensure that the housing is located in sustainable neighborhoods. After all, the tenants most in need—like the intended tenants of the proposed project—are entitled to a high-quality environment, just like their wealthier and better-resourced peers.
Critically, a reversal here would not sound the death knell of the project, it would only require HPD to conduct a more comprehensive environmental review process, in accordance with the law and the City's climate change agenda. The results of that review may support the project as currently proposed, or may identify other alternatives that enhance the project and provide even greater social and economic benefits to the community. Affordable housing and climate change efforts are not mutually exclusive goals. Respondents, not the courts, would weigh the relevant factors and make a determination on the environmental impact of the project, but as it now stands, HPD has not complied with its legal mandate.
Therefore, I would reverse the Appellate Division, invalidate the negative declaration, and remand the matter to respondents to conduct a full environmental review and prepare an EIS.
Chief Judge Wilson and Judges Garcia, Singas, Cannataro, Troutman and Halligan concur. Judge Rivera dissents in an opinion.
[*11]
Order affirmed, with costs, and certified question not answered as unnecessary, in a memorandum.

Footnotes

Footnote *:Allan Reiver died during the pendency of this litigation. The proceeding survives as to the remaining petitioners—the corporate lessee of the property, the not-for-profit organization that manages the operation of the property, the limited liability company that owns the adjacent property, and a local resident (see CPLR 1015).

Footnote 1:The United States rejoined the agreement in 2021, after the prior administration withdrew in 2017.

Footnote 2: Most of these new arrivals were immigrants, with the exception of Puerto Ricans, who, under the Jones Act of 1917, are United States citizens by birth (46 USC § 50101). Nevertheless, Puerto Rico holds a colonial status under the United States government and its residents do not receive full benefits of other United States citizens (United States v Vaello Madero, 596 US 159, 162 [2022]; Natalie Gomez-Velez, De Jure Separate and Unequal Treatment of the People of Puerto Rico and the U.S. Territories, 91 Fordham L Rev 1727, 1731 [2023]).

Footnote 3: According to the 1960 census, the area that now includes the Garden was 39% Italian and 9% Puerto Rican (see U.S. Bureau of the Census, U.S. Censuses of Population and Housing: 1960, Census Tracts, Final Report PHC[1]-104, Part 1, New York, N.Y. at 118, available at https://www2.census.gov/library/publications/decennial/1960/population-and-housing-phc-1/41953654v7.zip [accessed June 4, 2024]; 1960 US Census Map No. 4, Census Tracts in the New York SMSA, available at https://archive.lib.msu.edu/DMC/US_Census_Maps/pdfs/00000004.pdf).

Footnote 4:The CEQRTM has been revised since HPD issued the EAS and negative declaration but the revisions do not affect the analysis here.

Footnote 5:The individual lessee of the parcel was also a named petitioner, but he passed away during the litigation.

Footnote 6:I agree with the majority that petitioners' remaining claims are without merit (majority mem at 
996).